AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

| LODGED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 10/10/2023 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY:          DVE          DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

| FILED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 10/10/2023 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY:          M.M.          DEPUTY |

United States of America

v.

IVAN LARA DE LA ROSA,

Defendant

Case No. 8:23-mj-00506-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 9, 2023 in the County of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) | Possession with intent to distribute at least 5 kilograms of a cocaine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Elizabeth Miles
Complainant's signature

Elizabeth Miles, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 10, 2023

Judge's signature

City and state: Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
Printed name and title

AUSA: Benjamin Barron (x 3536)

**AFFIDAVIT**

I, Elizabeth Miles, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.  I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since September 2012.  I am currently assigned to the Los Angeles Field Division, Orange County District Office. During my employment with the DEA, I have received specialized drug trafficking investigation training, including on drug interdiction, wiretaps, money laundering, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, and undercover operations.  I have participated in numerous cases involving money laundering, drug trafficking, and the use of wire intercepts, search warrants, surveillance, and interviews of drug traffickers.  I am familiar with drug-trafficking methods of operation, including the distribution, storage, and transportation of controlled substances, the collection of proceeds of drug trafficking, and methods of money laundering. I am familiar with street terms involving controlled substances.

## II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of criminal complaints against and arrest warrant for Ivan LARA DE LA ROSA ("LARA DE LA ROSA") for violating Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)  (Possession with

1

Intent to Distribute 5 Kilograms or More of a Mixutre or Substance Containing a Detectable Amount of Cocaine).

3. Unless otherwise stated: The facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation; and physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly.  When I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or in a written report.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and arrest warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  All conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

4. On October 9, 2023, Jorge LARA DE LA ROSA "Jorge") and his brother, LARA DE LA ROSA, were traffic stopped in a car by the United States Border Patrol in San Clemente, California. LARA DE LA ROSA was the front passenger.  During the stop, officers seized approximately 95.41 kgs cocaine from two suitcases found, separately, in the rear seat and trunk of the car.  LARA DE LA ROSA later gave a *Miranda*-waived confession to his involvement in trafficking the seized cocaine.

## IV. STATEMENT OF PROBABLE CAUSE

5. Based upon my discussions with other federal and local law enforcement officers, and review of the Border Patrol reports, I know that on October 9, 2023, Border Patrol Agents DeMark and Devarie were on patrol in a marked vehicle on the I-5 freeway, on the northbound lanes near the Cristianitos exit.

6. At approximately 2:00 p.m., Agents DeMark and Devarie observed a white 2001 Eclipse bearing California license plate 8WRJ950. Based on DHS records checks, the agents were aware that this vehicle had crossed into the United States via the San Ysidro Port of Entry at approximately 5:04 a.m., approximately eight hours earlier, even though it takes approximately two hours to commute from the port of entry and Orange County. Further research by the agents revealed that when the vehicle crossed, it was occupied by Jorge LARA DE LA ROSA and Ivan LARA DE LA ROSA. Agents conducted further records checks and learned that Ivan LARA DE LA ROSA had a criminal history that included alien and drug smuggling, to include a 2019 conviction for drug smuggling. He had served 18 months with an additional two years of supervised release for his conviction. (Specifically, LARA DE LA ROSA sustained a federal conviction in the Southern District of California for importation of approximately 1.56 kilograms of heroin into the United States, in violation of 21 U.S.C. §§ 952 and 960. In January 2020, he was sentenced to 18 months' prison to be followed by 24 months' supervised release.)

7. Further, agents were aware that LARA DE LA ROSA previously crossed into the United States in September 2023 with

an individual who believed to be associated with a notorious Tecate-based drug and human trafficking organization.

8. When agents observed the vehicle, Jorge was driving. When the marked Border Patrol unit pulled near the Mitsubishi, agents observed the vehicle began to erratically change lanes, from the one lane to the two lane at approximately 67 mph, and then from the two lane to the three lane. Jorge had both hands on the steering wheel in a rigid manner, and was staring straight ahead without checking his mirrors or windows to see the marked Border Patrol unit. Based on the agents' training and experience, this type of driving is one of many indicators consistent with smuggling behavior. For instance, typical drivers do not change lanes unnecessarily, or appear to make an effort to not notice the marked Border Patrol unit near their vehicles. Jorge was displaying behavior of an attempt to be evasive. Jorge was then observed changing lanes again, from the two lane to the three lane, and again from the three lane to the four lane. He was then observed using his turn signal when there was no exit near his location.

9. Based on Jorge's rigid posture and driving behavior, in addition to the unusually long delay in travel time, as well as LARA DE LA ROSA's criminal history which included smuggling behavior, Border Patrol Agents initiated a traffic stop of the vehicle.

10. During the traffic stop, Jorge stated that the two had crossed into the United States that morning and had a meal with his brother's (LARA DE LA ROSA) friend and girlfriend. They

4

stated the friend's name, but said that they did not know the girlfriend's name.  When asked why the meal had taken so long, they added that they had gone to the friend's house.  They then stated that the intended to go shopping and that they were staying in Los Angeles overnight, although they did not have a hotel room.  LARA DE LA ROSA then told agents that they had an aunt living in Los Angeles who they could stay with, but they did not know where she lived.

    11.  When agents asked for consent to search the vehicle, Jorge granted consent, stating he did not have any illegal contraband in the car.  Agents observed a large suitcase stuffed in the backseat of the small vehicle.  LARA DE LA ROSA stated it was his suitcase.  When asked for consent to search the suitcase, LARA DE LA ROSA responded that he did not know why or understand why agents would wish to search his suitcase.  LARA DE LA ROSA asked agents what would happen if he refused to give consent.  Agents explained to him that they would request the assistance of a trained K-9.

    12.  At this time, agents observed LARA DE LA ROSA begin to use his vape pen, nervously smoking.  Agents asked LARA DE LA ROSA if he had a criminal history, he said he did not.  When they asked again, he admitted to having prior criminal history involving human smuggling and narcotics trafficking.

    13.  Jorge stated that he was asked by his brother (LARA DE LA ROSA) to help drive LARA DE LA ROSA as a favor.  Jorge stated that he has clothing in a separate section of the vehicle, in the trunk.  When Jorge stated he was doing a favor for his

brother, LARA DE LA ROSE interjected that the family had four siblings.

### Border Patrol K-9 Alert to the Vehicle

14. At this time, agents requested the assistance of Border Patrol Agent Meehan and his K-9 partner "Sherkan." When he arrived, Agent Meehan identified himself and asked who owned the vehicle. Jorge stated that the vehicle was his. Agent Meehan asked for permission to run his service animal around the vehicle for an "open air sniff." Jorge agreed. When Agent Meehan asked if he could put his service animal inside the vehicle, Jorge declined to give consent. Agent Meehan explained that if the trained K-9 alerted to the vehicle, he would have probable cause to search the vehicle. Agent Meehan's K-9 immediately alerted to the trunk of the vehicle.

15. A subsequent search of the vehicle revealed two large suitcases, one in the backseat of the car and one in the trunk. The suitcases contained, in total, approximately 74 kilogram-shaped packages. The brothers were arrested and transported to the San Clemente Border Patrol checkpoint without incident.

### DEA INTERVIEWS OF JORGE AND IVAN LARA DE LA ROSA

16. DEA agents Miles, McManus, and Blair arrived to the checkpoint and interviewed both brothers. SA McManus read both individuals their rights under *Miranda* and both agreed verbally and with written consent to answer questions. Additionally, both men gave agents oral and written consent to search their cellular phones. At the request of both brothers, the interviews were conducted with Spanish-speaking agents, although

both brothers – and in particular DE LA ROSA – appeared to also speak and understand English.

17. Jorge told agents he did not have a criminal history and had agreed to do a favor for his brother. He stated that his brother asked him for a ride and, in exchange, had agreed to take him shopping at Outlets in San Clemente. Jorge stated that when they arrived in San Diego, they met with his brother's friend and that Jorge observed the suitcases being loaded into his car. Jorge stated he became suspicious at this time, but continued on. Jorge stated he did not know there were drugs in his car until he observed his brother acting extremely nervous and evasive during the traffic stop. A review of Jorge's phone during the interview appeared to corroborate his statements.

18. Agents advised LARA DE LA ROSA of his *Miranda* rights in Spanish, following which he agreed to answer questions. Initially, LARA DE LA ROSA told agents an individual known as "Ernesto" told him to pick up the suitcases. He also said that he was told to drive the suitcases to the Outlets in San Clemente. He stated he had not transported drugs since his prior arrest and prison service. However, during the interview, agents were reviewing LARA DE LA ROSA's cellular phone in front of him, pursuant to his earlier consent, and observed multiple texts and WhatsApp conversations related to drug trafficking. When agents pointed out the inconsistencies in his statements when compared to his phone messages, LARA DE LA ROSA told agents his brother, Jorge, did not know what they were doing. When LARA DE LA ROSA was questioned about pictures of guns in his

7

phone, he stated that had just been sent to him by friends and that he had never been involved with gun smuggling. When LARA DE LA ROSA was told that he was facing a significant time in prison for his new charges, he began giving further statements, to include that he was going to be paid $2,000 to transport these drugs. Throughout the interview, although LARA DE LA ROSA appeared to offer some information, agents believed he was concealing a significant amount of useful information and continuing to evade direct questions. The interview was concluded and he was transported to Santa Ana Jail for further proceedings.

      19. In total, LARA DE LA ROSA was transporting 74 packages, weighing approximately 95.41 kilograms. At the San Clemente Border Patrol Station, the white substance was weighed and tested, using a Tru Narc handheld narcotics analyzer. The packages tested positive for cocaine.

///

## **CONCLUSION**

20. For all the reasons described above, there is probable cause to believe that LARA DE LA ROSA violated Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii) (Possession with Intent to Distribute Five Kilograms or More of a Mixture of Substance Containing a Detectable Amount of Cocaine).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 10th day of
October 2023

_____
JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE